CASE NO. 21-81398-CIV-CANNON

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# WEST PALM BEACH DIVISION

CASE NO. 21-81398-CIV-CANNON

**NATHALIE PHILANTROPE**,

    Plaintiff,

v.

**RICHARD JEAN**,

    Defendant.

_____/

## ORDER GRANTING PETITION FOR RETURN OF CHILD

**THIS CAUSE** comes before the Court upon Petitioner's Verified Petition for Return of Minor Child to Chile and Request for Warrant of Arrest in Lieu of Writ of Habeas Corpus ("Verified Petition") [ECF No. 1], filed on August 11, 2021. The Court has carefully considered the Verified Petition; the Response to the Court's Order to Show Cause ("Response") filed by Respondent [ECF No. 15]; Respondent's Statements of Facts [ECF Nos. 24 and 25]; and Petitioner's Proposed Findings of Facts and Conclusions of Law [ECF No. 27]. The Court also held an evidentiary hearing on October 12, 2021 [ECF No. 21]. Respondent appears *pro se*.[1]

For the reasons set forth below, the Verified Petition is **GRANTED**.

## INTRODUCTION

On August 11, 2021, Petitioner Nathalie Philantrope ("Mother" or "Petitioner") filed a Verified Petition pursuant to the Hague Convention on the Civil Aspects of International Child

---

[1] On September 14, 2021, the Court referred Respondent to the Volunteer Attorney Program and permitted time for Respondent to obtain *pro bono* counsel. Respondent appeared *pro se* in all Court proceedings [ECF No. 14 (Consent by *Pro Se* Litigant to Receive Notices of Electronic Filing)], including the Final Evidentiary Hearing.

1

Abduction, October 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11 (the "Hague Convention" or "Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq*. ("ICARA") [ECF No. 1]. Petitioner seeks the immediate return of her four-year-old son R.J.P. ("R.J.P." or "Child") to Chile [ECF No. 1, p. 22].

Following an evidentiary hearing, the Court finds that R.J.P. was wrongfully removed from Chile, his habitual place of residence, to the United States by his father, Respondent Richard Jean ("Father" or "Respondent"). The Court further finds that, although more than one year has passed between the date of wrongful removal and the date of filing the Verified Petition, R.J.P. is not well-settled in his new environment within the meaning of Article 12 of the Hague Convention, due in part to Respondent's actions of transferring the Child through multiple international and U.S. jurisdictions since his wrongful removal in March 2019. Accordingly, the Court hereby orders that R.J.P. be returned forthwith to Petitioner in Chile.

## THE HAGUE CONVENTION AND THE ICARA

The Hague Convention, to which Chile and the United States are signatories, "applies to children under sixteen years of age who are 'habitually resident' in a contracting state (Convention, Art. 4) and are 'wrongfully removed' to another contracting state (Convention, Art. 1)." *Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014). Pursuant to the Convention,

> [a] child is 'wrongfully removed' when (a) the removal 'is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident,' and (b) at the time of removal the rights of custody 'were actually exercised' by the person having those rights (Convention, Art. 3). The term 'rights of custody' includes 'rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence' (Convention, Art. 5).

*Id*.

Under this framework, Petitioner must prove by a preponderance of the evidence that: (1) R.J.P. was habitually resident in Chile at the time Respondent removed him to the United States; (2) the removal was without Petitioner's consent and constituted a wrongful breach of her custody rights under Chilean law; and (3) Petitioner was actually exercising those custody rights at the time of the removal. *See id.*; 22 U.S.C. § 9003(e)(1)(A).

If Petitioner meets her initial burden, R.J.P. must be returned to Chile "forthwith" unless Respondent establishes one of the exceptions recognized under the Hague Convention. *See Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016). Those exceptions are: (1) the person requesting return was not, at the time of the retention or removal, actually exercising custody rights, or had consented to, or subsequently acquiesced in, the removal or retention; (2) the return would result in grave risk of physical or psychological harm to the child; (3) the child's return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms"; or (4) the return proceedings commenced more than one year after the abduction and the child has become settled in the new environment. *See In re Leslie*, 377 F. Supp. 2d 1232, 1238 (S.D. Fla. 2005) (discussing exceptions under Articles 12 and 13 of the Hague Convention). These exceptions are to be construed narrowly and must be proven by a preponderance of the evidence, *Gomez*, 812 F.3d at 1011, except that a respondent "bears the burden of establishing the grave risk exception by clear and convincing evidence." *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008); *see* 42 U.S.C. § 11603(e)(2)(A).

## FINDINGS OF FACTS

The Court heard testimony from the following witnesses during the October 12, 2021 evidentiary hearing:

1. Javiera Verdugo – Chief Attorney at the Chilean Judicial Ministry (Corporación de Asistencia Judicial de la Región Metropolitana), the Central Authority for Hague Applications in Chile.

2. Nathalie Philantrope – Petitioner and Mother of R.J.P.

3. Sarah Franco; CEO of the non-profit organization maintaining temporary custody of R.J.P.

4. Michelle Geli – A licensed clinical social worker and registered supervisor who worked with Sarah Franco to assist R.J.P. while he was in temporary custody.

5. Richard Jean – Respondent and Father of R.J.P.

6. Clarissa Dauphin – Wife of Respondent.

The Court finds the witnesses' testimony to be credible except with regard to certain aspects of Respondent's testimony as noted in this Order. Additionally, the Court admitted into evidence the following exhibits offered by Petitioner:

1. Exhibit A – Travel Certificate from the Investigations Police of Chile.

2. Exhibit B – United States Department of State Voluntary Return Letter to Richard Jean.

3. Exhibit C – WhatsApp Text Message between Petitioner and Respondent (with attached Translation from Haitian-Creole to English and Translation Affidavit) requesting that Petitioner send an authorization letter to Respondent.

4. Exhibit D – WhatsApp Text Message between Petitioner and Respondent (with attached Translation from Haitian-Creole to English and Translation Affidavit) requesting Child's passport.

5. Exhibit E – WhatsApp Text Message between Petitioner and Respondent (with attached Translation from Haitian-Creole to English and Translation Affidavit) containing draft letter to Mr. Osorno, a U.S. Department of State employee, in English.

6. Exhibit F – WhatsApp Text Message between Petitioner and Respondent with attached Translation from Spanish to English and Translation Affidavit; containing draft letter to Mr. Osorno in Spanish.

7. Exhibit G – Chilean Identification Card for Petitioner.[2]

***

The Court has taken testimony and evidence from the parties and finds the following facts.

Petitioner and Respondent were both born in Haiti but later moved to Chile where the minor child ("Child") was born. Petitioner Nathalie Philantrope is the Child's mother ("Mother"); Respondent Richard Jean ("Father") is the Child's father. The Mother and Father were never married. The Child was born in Chile on February 13, 2017, and has been a Chilean citizen since birth. There is no dispute between the Parties as to this issue.

The Mother and Father's relationship deteriorated within a few months of the Child's birth, and they began living separately from one another. The Mother was the primary caregiver and custodian for the Child. At first, the Father had only sporadic video chat calls with the Child, but as the Child approached his second birthday, the Father showed a desire to have a more active role in the Child's life. The Mother, then, permitted the Father to have short visits with the Child.

On March 5, 2019, during one of the visits with the Child, the Father told the Mother that, ostensibly, he was taking the Child to go shopping for preschool supplies. The Father never returned the Child to the Mother. The Mother checked with the Child's preschool/daycare center the following day when the Child should have been at daycare, but she was informed by personnel at the center that they had not seen or heard from the Father or the Child.

The Mother contacted the Chilean Police the same day of the removal (March 5, 2019). The Chilean Police then began an investigation into the whereabouts of the Father and Child. A court case was opened at the prosecutor's Local Office of La Florida, Chile, in March 2019, with

---

[2] [ECF No. 23 (sealed)]; see ECF Nos. 1-1, 1-2, 1-3, 1-4, 1-5].

Case Number 1900272687-7 [ECF No. 1-1]. Chilean police officials were unable to locate the Child. As part of their investigation, the Chilean Police requested from Chilean border patrol a report of the Father and Child's migratory movements. On April 5, 2019, the Mother received a letter from the Chilean Police stating that there was no record indicating that the Father and Child had legally exited Chile through an official border crossing [ECF No. 1-1]. The Mother then promptly commenced custody proceedings in Chilean family court because the evidence available to her at that point suggested that R.J.P. had not left the country.

The Mother did not receive any communication from the Father after the Child's removal until June 25, 2019. On that date, the Father called the Mother but did not indicate where he had taken the Child. Finally, in July 2019, the Father called from a number with a "52" country area code, which suggested to Petitioner that Respondent had taken the Child to Mexico. During a later video call around that time, the Mother was able to take a screenshot showing a car with a Texas license plate in the background, which suggested that Respondent had crossed the border into the United States [ECF No. 1-2].

In August 2019, after learning that her Child was in Mexico or in the United States, the Mother went to the Chilean Ministry of Justice to begin the process of filing a Hague Application for the return of the Child to Chile. The Chilean Ministry of Justice serves as the Central Authority for processing Hague Applications. Petitioner was assisted in her application by Javiera Verdugo, Chief Attorney of the International Office of the Chilean Central Authority. Ms. Verdugo has served in this role for nine years. She is also a specialist in Family Law and a Professor of Family Law at the University of Chile. Ms. Verdugo met with the Mother and reviewed the case.

Ms. Verdugo testified that that there are three ways to establish custody under Chilean law: (1) a written, notarized agreement between parents that is filed into the civil registry within thirty days of signature; (2) a court order granting custody to a parent; and (3) Chile's recognition of "*patria potestad*," which provides for joint custody by both parents. Ms. Verdugo testified that she searched court records in Chile for either a notarized agreement or a court order granting custody to either parent but did not locate any records. Accordingly, Ms. Verdugo determined that the Mother was exercising her *patria potestad* custody rights prior to the time of the Child's wrongful removal and had a *ne exeat* right requiring that the Father obtain the Mother's consent before the Child could legally be removed from the country.

Ms. Verdugo also testified that (1) she reviewed all available reports and information and had no concerns about the safety of the Child if returned to the Mother; and (2) the Mother was the primary caregiver for the Child and had attained legal permanent resident status in Chile allowing her to work and travel freely [*see* ECF No. 23, pp. 20-21].

Finally, Ms. Verdugo stated her view that Petitioner had been "very, very diligent in her handling of this case," attending every appointment and responding immediately to every development in the case. Accordingly, based on her review of the Mother's case and Chilean law, Ms. Verdugo concluded that the Father had breached the Mother's custody rights by exiting Chile without the Mother's consent.

At this point in August 2019, not certain whether the Child was still in Mexico or had entered the United States, Ms. Verdugo caused Petitioner's Hague Application to be sent to the central authorities for both Mexico and the United States [ECF No. 1-3 (Hague Application dated August 23, 2019)]. The central authority for the United States is the United States Department of State, Office of Children's Issues ("U.S. State Department"). The U.S. State Department was able

to locate the Father in Texas and thereafter sent him a Voluntary Return Letter, dated February 24, 2020, advising him of Petitioner's application and seeking the voluntarily resolution of the family conflict [ECF No. 1-5]. The letter states as follows, in pertinent part:

> If we have not received your response by March 10, 2020, or if you elect not to return the child to Chile and/or come to some resolution that is mutually agreeable to you and Ms. Philantrope, then we, as the U.S. Central Authority, will be obligated under Article 7(f) of the Convention to continue processing the application and to facilitate the initiation of judicial proceedings by Ms. Philantrope to have a court in the United States determine [R.J.P.'s] country of habitual residence and where custody should be decided.

[ECF No. 1-5, p. 3].

The Father responded to the Voluntary Return Letter by stating that he was trying to work out the custody issues with the Mother. The Father subsequently asked the Mother to provide him with the Child's passport and to sign a letter indicating that she authorized him to take the Child [ECF No. 23 pp. 8-11].[3] The Mother did not comply with the Father's requests and testified that she did not comply because she believed the Father was trying to trick her, and that she never agreed to the Child being removed from Chile.

In or around August 2020, in the absence of a resolution to the family conflict, and against the backdrop of the COVID-19 pandemic and associated administrative delays, the U.S. State Department began the process of finding *pro bono* counsel for the Mother in Texas. Over the next several months, and after contacting several lawyers to take her case, one lawyer in Texas agreed to represent her. But then, in February 2021, the lawyer in Texas discovered that the Father had

---

[3] In the months after the Father left with the Child, the Mother learned that the Father (prior to removing the child) had obtained a new national identification card for the Child and had ordered but not received a Chilean passport for the Child. The passport has been in the Mother's possession at all relevant times, and although the Father has requested the Mother to send him the Child's passport, the Mother has not done so.

8

moved to Florida. The lawyer informed the Mother that he/she was not licensed in Florida and thus would not be able to assist her.

The U.S. State Department then began a new search to find *pro bono* counsel for the Mother in Florida. After similar delays finding counsel in Florida,[4] the U.S. State Department eventually found Petitioner's current counsel [ECF No. 1, pp. 13-14].

On August 11, 2021, now represented in Florida by her current counsel, Petitioner filed the instant Verified Petition with supporting attachments [ECF No. 1]. Petitioner also filed an Omnibus Motion asking the Court, on an *ex parte* basis, to place the Child in temporary custody pending the outcome of the final hearing in the case [ECF No. 2]. The Court granted that request [ECF No. 10], and on September 8, the Child was removed from the Father's custody and placed in the temporary custody of a non-profit group licensed by the Florida Department of Children and Families ("DCF").

Two witnesses from the DCF-licensed group with temporary custody of the Child testified at the final evidentiary hearing: Sarah Franco and Michelle Geli. Ms. Franco is the founding director and CEO of the DCF-licensed group and has worked there for 29 years. Ms. Geli is a Licensed Clinical Social Worker at the DCF-licensed group and previously worked at a hospital as a social worker dealing with childhood trauma.

Ms. Franco testified that she oversaw the safe pickup of the Child from Respondent's home on September 8, 2021. Ms. Franco testified that, during an initial supervised Zoom video call between R.J.P. and the Father, she heard the father say that he never had "permission" to remove

---

[4] One of the *pro bono* attorneys representing Petitioner in Florida had health issues and was unresponsive to Petitioner's communication, leading to a months-long delay in case progression. Eventually, the U.S. State Department helped Petitioner obtain her current counsel in Florida to file her Verified Petition.

9

the Child from Chile.  Ms. Franco also testified that, based on her years of training and experience, it appeared that the Child had been "alienated" from his Mother because he referred to his mother by her first name ("Nathy").  However, Ms. Franco testified that, in recent supervised conversations, the Child and Mother appeared to be breaking through that "alienation" and were showing signs of "bonding."

Similarly, Ms. Geli testified that she heard the Father state during the initial video call with the Child that he removed the Child from Chile without "permission."  Ms. Geli testified that, during the same initial video call, she asked the Father if he knew that taking a child away without permission was akin to kidnapping.  The Father agreed with Ms. Geli that his actions could be considered kidnapping.  In a later supervised conversation, Ms. Geli told the Father that they would see each other soon at the Court for the evidentiary hearing and asked the Father how he was feeling.  The Father expressed to Ms. Geli that if the law were followed, he was "pretty sure" that the Child would be returned to the Mother.   Ms. Geli testified that, based on her conversations with the Father, it was clear to her that he did not leave Chile with permission or consent from the Mother.

The Father also testified on his own behalf at the evidentiary hearing.  He testified that he never applied for a visa to live in the United States with the Child, but now lives in Florida and works as a groundskeeper.  He stated that he did not think he would meet the criteria to obtain a visa because he did not have steady employment or sufficient funds in his bank account.  The Father testified that the Mother was unemployed in Chile, and that he had previously experienced a violent encounter when the Mother's boyfriend pulled a gun and threatened him, two factors which influenced his decision to leave Chile with the Child.

To exit Chile, the Father testified that he took a plane to an unspecified location near the border between Chile and Peru, drove across the border in a car into Peru, and then boarded a bus with the two-year old Child and his other minor daughter from a prior relationship. The Father stated that they then travelled by bus across ten countries in South America before finally arriving illegally in Mexico. The trio then illegally crossed the Rio Grande River into Texas and finally reached the United States. He estimated that the entire journey took about three months. When asked whether he and his Child faced dangers on the journey, he said that he had heard stories about dangers associated with this journey but did not discuss specifics or identify any specific dangers he and his children encountered.

The Father testified that he did not leave Chile without the Mother's consent, and that she initially agreed to join him in his journey to the United States but later changed her mind. The Father stated that before he left Chile, he tried to drop off the Child at the Mother's house, but the Mother stated that she was "too busy" and that the Father should "do what he wanted" with the Child. The Father testified that, after leaving Chile, the Mother was aware of every move he made in his journey. He stated that the Mother previously agreed to send the Child's passport to him but ultimately changed her mind. According to the Father, he has never tried to hide his whereabouts, and it "was not a surprise" to Petitioner that he left Chile with the Child. The Father did not offer supporting evidence for this testimony, and he did not deny that he made the earlier described statements to Ms. Franco and Ms. Geli about taking the Child without permission from Chile—although he maintained that Petitioner acquiesced to the removal.

Having heard Respondent's testimony on the question of consent/acquiescence, and in view of the entire record, the Court rejects Respondent's testimony that he obtained Petitioner's

consent to remove the Child; that Petitioner gave him permission to "do what he wanted"; and that Petitioner otherwise acquiesced in the removal of the Child from Chile.

## CONCLUSIONS OF LAW

### A. R.J.P. Was a Habitual Resident in Chile at Time of Removal

To establish a *prima facie* case, Petitioner must establish the following by a preponderance of the evidence: (1) the Child was a habitual resident of Chile immediately before being removed and eventually brought to the United States; (2) the Respondent's removal and retention of the Child violated the Petitioner's rights of custody under Chilean law; and (3) the Petitioner had been exercising her rights of custody at the time of the wrongful removal. *See Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020); *see also* 22 U.S.C. § 9003(e)(1). The Respondent does not contest that the Child was a habitual resident of Chile but argues that he had joint custodial rights to the Child with the Mother, and that the Mother verbally acquiesced to his removal of the Child. For the reasons stated earlier, the Court rejects Respondent's testimony to that effect and finds that Petitioner did not consent to the removal of her child or otherwise agree or acquiesce in that removal.

More specifically, Javiera Verdugo testified that the Mother was the primary caregiver for the Child and had full custody rights for the Child under Chilean law.[5] Among her custodial rights, Ms. Verdugo testified that the Mother had a *ne exeat* right under Chilean law, and that the Father's removal of the Child without express permission violated that right. A *ne exeat* right is "authority to consent before the other parent may take the child to another country." *Abbott v. Abbott*, 560

---

[5] As reaffirmed *infra* p. 19, this Order does not purport to make or suggest any ultimate resolution of the custodial dispute between Petitioner and Respondent. Pursuant to the Hague Convention, that is a question reserved for Chilean judicial authorities in accordance Chilean law, and nothing in this Order should be construed as a determination on the underling custody issue.

U.S. 1, 5 (2010) (discussing that Chile, specifically, recognizes *ne exeat* rights and that this is a sufficient custody right to order return of the child for purposes of the Hague Convention). The Mother exercised her *ne exeat* right when she did not give express permission for the Father to remove the Child from Chile, did not help the Father obtain a passport for the Child, and initiated a police investigation to locate her child when it was unknown whether the Father had left Chile.

Moreover, the Mother currently maintains the Child's passport; she never sent the passport to the Father despite his requests; and there is no evidence to support Respondent's assertion that Petitioner gave Respondent consent to remove the Child from Chile. The Father suggested as much during the hearing, but this is contradicted not only by his surreptitious movement through ten countries, but also by the two witnesses who testified at the hearing that the Father told them he did not have permission to remove the Child from Chile. The Court does not find credible the Father's testimony that the Mother gave him permission or otherwise acquiesced to the Father's taking of the Child from Chile.

Based on these facts, the Court finds that the Mother has shown by a preponderance of the evidence that (1) she has a *ne exeat* right and that she was exercising her custodial rights at the time of the Child's removal; (2) she did not give the Father her permission to remove the Child from Chile; and (3) the Father's removal of the Child breached her rights of custody. Accordingly, the Mother has established a *prima facie* case. The Court turns to whether the Father has proven any exception to return.

### B. Respondent Has Not Established that a Convention Exception Applies

"[T]he Conventions reflects a design to discourage child abduction, *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014), but it includes exceptions where the return remedy may not be appropriate, even if a *prima facie* case is established, *id*; *see also* Hague Convention; arts. 12, 13,

13

20; *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1357 (M.D. Fla. 2002). These exceptions must be applied narrowly. *See* 22 U.S.C. § 9003(a)(4). Moreover, even where a Respondent proves an exception, the Court has discretion to return the child if doing so would further the aims of the Convention.

### 1. Respondent Has Not Met His Burden to Show That R.J.P. is Well-Settled

Under Article 12, if a Hague Petition is filed more than one year after the child was wrongfully removed, a Court need not order his or her return if "it is demonstrated that the child is now settled in its new environment." Convention, Art. 12. The Father must prove that this exception applies by a preponderance of the evidence. *See Fernandez v. Bailey*, 909 F.3d 353, 361 (11th Cir. 2018). Both parties agree that the Child has been in the United States for over a year before the Petition was filed.

The term "well-settled" in this context means more than having a comfortable material existence. *Lops v. Lops*, 140 F.3d 927, 947 (11th Cir. 1998). In determining whether the Child is settled, the Court considers the totality of the circumstances. *Fernandez*, 909 F.3d at 360. A child is settled when "the child has significant connections to their new home that indicates the child has developed a stable, permanent, and non-transitory life in their new country to such a degree that return would be to the child's detriment." *Id*. Factors courts consider when determining whether a child is settled include:

> the child's age; the stability and duration of the child's residence in the new environment, whether the child attends school consistently; the stability of the retaining parent's employment and financial circumstances; whether the child has friends and relatives in the new area; whether the child participates in community or extracurricular school activities; the child's immigration status; the respondent's immigration status; whether the child has been concealed in his new location; and the reasons for any delay in initiating the petition for the child's return.

*De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1200 (M.D. Fla. 2016) (citation omitted); *see also Fuentes-Rangel V. Woodman*, 617 F. App'x 920, 922 (11th Cir. 2015).

Under the totality of the circumstances, the Father has not established that the Child is well-settled. Although the Father stated in his Response that R.J.P. (now 4 years old) recently became age-eligible to attend preschool and has built family connections with his half-siblings in their Florida home [ECF No. 15, p. 11], the following facts undermine the notion that he has become well-settled in the United States:

- R.J.P. entered the United States illegally through the Mexican border in June 2019 after a long and difficult three-month journey by plane, bus, and by foot with his Father through ten countries in South America, with few resources for his care, and under dangerous circumstances.

- R.J.P.'s whereabouts were concealed from Petitioner for months after the removal.

- Respondent left Chile without passing through authorized channels or interacting with official border personnel during their passage and illegal entry into the United States.

- Respondent crossed into Texas with R.J.P. and lived there with R.J.P. for approximately 11 months (during which Respondent met his current spouse).

- Respondent then moved R.J.P. to Florida in approximately August 2020, again without consent from Petitioner.

- R.J.P. has not begun attending school consistently in the United States, and there is no record evidence that he has established community connections via extracurricular activities or otherwise.

On this record, which reflects a pattern on the part of Respondent of failing to disclose his movements and the whereabouts of R.J.P. to Petitioner, Respondent has not proven by a

preponderance of the evidence that the Child is now well-settled in the United States under Article 12 of the Convention. The Court has considered the totality of the circumstances in this assessment, including the reasons for Petitioner's delay in filing the Verified Petition. On that point, the Court notes the credible testimony of Ms. Verdugo, an experienced attorney in Hague Convention applications, who worked closely with Petitioner and testified unequivocally that Petitioner did everything she could within her control to seek the return of her Child. The Court also determines, based on a review of the full record, that denying the Petition on these facts would thwart the aims of the Hague Convention to discourage international child abduction. *See Lozano*, 572 U.S. at 17, 20 (2014) (analyzing the well-settled exception and stating that "American Courts have found as a factual matter that steps taken to promote concealment can also prevent the stable attachments that make a child 'settled'").

### 2. Respondent Has Not Established a Grave Risk of Harm to R.J.P. if Returned to Chile

The Father also argues in his Response [ECF No. 15, pp. 9-10] that there is a grave risk of harm in Chile sufficient to keep the Child in the United States. Under Article 13(b) of the Convention, a court is not bound to order the return of a child if "there is a grave risk that his or her return would expose the child to physical and psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). The Father must prove this defense by "clear and convincing evidence." *Gomez*, 813 F.3d at 1010. The standard for invoking this defense is high: "to invoke the defense, the party seeking to establish the exception must show that the risk to the child is grave, not merely serious." *Id*. at 1012. (quotations marks and citation omitted).

The Father's Response makes generalized statements about what he describes as discrimination toward Haitian people in Chile and a former uncorroborated threat of violence directed toward him from the Mother's current boyfriend in Chile [ECF No. 15, pp. 9-10]. He also

claims that Petitioner has only temporary status in Chile and could be sent back to dangerous circumstances in Haiti, but the record contains a copy of Petitioner's permanent residence card in Chile [ECF No. 23, pp. 20-21], and Ms. Verdugo testified that such residence grants Petitioner status to work and live permanently in Chile. Respondent's generalized assertions fail to articulate any demonstrable harm, grave or otherwise, directed at the Child [ECF No. 15, pp. 9-10]. *See Gomez*, 812, F.3d at 1010. Nor is there any credible evidence in the record to suggest that the Child would be at risk while in the Mother's care.[6]

Respondent has failed to establish, by clear and convincing evidence, that a grave risk of harm to the Child exists if the Child is returned to Chile.

### 3. Respondent Has Not Shown that Petitioner Consented to Removal

Respondent also claims, without documentary support, that Petitioner acquiesced to the Child's removal from Chile. As already determined, these representations are not consistent with the record before the Court. Indeed, immediately after Respondent removed R.J.P. on March 5, 2019, the Mother instituted a police investigation for the return of her child and then commenced family court proceedings in Chile. Since then, as testified to by Ms. Verdugo, Petitioner has consistently taken steps to obtain the return of her Child based on the information available to her;

---

[6] The Mother testified that she experienced domestic abuse from the Father when she was living with him and stated that a court in Chile ordered the Father to undergo anger management. The Mother did not provide any documentary evidence to support the existence of a previously filed case to that effect, and the Court therefore does not consider this testimony or draw any conclusions from it. It bears noting, however, that Ms. Verdugo clarified at the hearing that it is not uncommon for laypersons filing such reports in Chile to meet first with non-judicial court personnel to resolve the matter, and then to confuse that interaction with an official judicial determination or with the commencement of an official court proceeding. This may explain Petitioner's understanding. In any event, and more fundamentally, Ms. Verdugo testified that she vetted Petitioner during the Hague application process and never had any concerns about whether the Child would be safe with her if returned. Respondent testified that, an unspecified point, without corroboration, Petitioner's boyfriend in Chile threatened him with a gun, but Petitioner testified that neither she nor her boyfriend own a firearm. The Court does not find a basis on this record to find grave danger.

she never agreed to comply with the Father's requests to send the Child's passport to him; and the record contains no evidence of her consent to the Child's removal. The Mother worked diligently through the lawful channels available to her to find counsel—first in Texas based on Father's presence there and then in Florida after discovering in 2021 that the Father had moved to Florida. Moreover, two witnesses testified credibly that the Father himself admitted to removing the Child from Chile without consent.

### C. The Court's Discretion

Return of the Child to Chile is warranted because the Mother has established a *prima facie* case for the return remedy, and the Father has failed to show that any of the Hague Convention's exceptions applies. To the extent it can be said that the Father has proven that an exception to return applies—a determination as to which the Court finds insufficient evidence for the reasons stated herein—the Court still would exercise its discretion to return the Child because doing so furthers the aims of the Convention. *Fernandez*, 909 F.3d at 363.

The "two primary objectives" of the Convention are to promptly return children wrongfully removed or retained and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State." *Id*. (citing *Alcala v. Hernandez*, 826 F.3d 161, 175 (4th Cir. 2016)).

The proper place for this custody dispute is in Chile. The Father could have initiated custody proceedings in Chile, including a request to relocate with the Child to the U.S. Instead, he removed the Child out of Chile and traveled across multiple international jurisdictions, ultimately entering the United States illegally to effectuate the wrongful removal. This is the type of harm the Hague Convention was designed to address. *See Karpenko v. Leendertz*, 619 F.3d 259, 265-66 (3d Cir. 2010) ("The Hague Convention discourages parents from resorting to the

most extreme form of interference [with rights of custody], child abduction, by providing a judicial remedy for removal"); *Fuentes-Rangel v. Woodman*, 617 F. App'x 920, 922 (11th Cir. 2015) (agreeing with the district court that permitting the child to remain in the U.S., even where exception to return was proved, would condone father's "conscious decision to opt out of established legal process in favor of international 'self-help'").

It goes without saying that, in deciding the issues of habitual residency and wrongful removal in this Order, the Court neither makes nor purports to make to make any determination as to the underlying custody issue. "The central purpose of the Convention and ICARA in the case of an abducted child is for the court to decide as a gatekeeper which of the contracting states is the proper forum in which the issue of custody should be decided." *Seaman*, 766 F.3d at 1257.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Petitioner's Verified Petition, Pursuant to the Hague Convention, for Return of Child to the Country of Habitual Residence [ECF No. 1] is **GRANTED**.

2. The DCF-approved organization currently maintaining temporary custody for the Child is directed to confer with counsel for Petitioner to effectuate the Child's return to his habitual residence of Chile as soon as practicable but no later than **November 2, 2021**.

3. The Clerk of Court is directed to release R.J.P.'s birth certificate, social security card, and Republic of Chile identification card to Petitioner's counsel. Those items previously have been deposited in the Court Registry.

4. The Clerk of Court is instructed to **CLOSE THIS CASE**. All pending motions are **DENIED AS MOOT**, all deadlines are **TERMINATED**, and all hearings are **CANCELLED**.

CASE NO. 21-81398-CIV-CANNON

**DONE AND ORDERED** at Fort Pierce, Florida this 19th day of October 2021.

                                                **AILEEN M. CANNON**
                                                **UNITED STATES DISTRICT JUDGE**

cc:    counsel of record